# IN THE SUPREME COURT OF IOWA

No. 18–0018

Filed May 17, 2019

**SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 199,**

Appellant,

vs.

**STATE OF IOWA, IOWA BOARD OF REGENTS,**

Appellee.

---

Appeal from the Iowa District Court for Polk County, Jeffrey D. Farrell, Judge.

Public employee union appeals summary judgment dismissing action to enforce alleged collective bargaining agreement. **AFFIRMED.**

Charles Gribble and Christopher Stewart of Parrish Kruidenier Dunn Boles Gribble Gentry Brown & Bergmann, L.L.P., Des Moines, and Nathan Willems of Rush & Nicholson, Cedar Rapids, for appellant.

Andrew T. Tice of Ahlers & Cooney, P.C., Des Moines, for appellee.

**WATERMAN, Justice.**

In this appeal, we must determine whether the Iowa Board of Regents and a public employee union entered into an enforceable collective bargaining agreement. The fighting issue is the validity of an agency rule that requires the Board to meet to vote to accept a tentative voluntary agreement ratified by the union before the contract becomes effective. The parties' negotiations are governed by the Public Employment Relations Act (PERA), Iowa Code chapter 20, and rules promulgated by the Public Employment Relations Board (PERB). Iowa Code section 20.17(4) (2017) provides that "[t]he collective bargaining agreement shall become effective only if ratified by a majority of [union members] voting by secret ballot." This statute makes no mention of requiring the public employer to vote to ratify the agreement, but a related statute generally requires final action to be conducted in an open meeting. Iowa Code § 21.5(3). In 1976, PERB enacted Iowa Administrative Code rule 621—6.5 to implement the voting requirements for both the employer and union.[1] The union and Board had each voted to ratify their voluntary collective bargaining agreements consistent with that rule in 2009, 2011, and 2015. However, in 2017, the Board did not vote to approve the proposed agreement ratified by the union.

The union filed this action under Iowa Code section 20.17(5) to enforce the collective bargaining agreement. The Board moved for summary judgment, relying on rule 621—6.5(3). The union argued the agency rule was invalid because it imposed a ratification requirement not included in section 20.17(4). The district court, reading chapter 20 and

---

[1]This rule was renumbered in August 2017 prior to the district court's summary judgment and was formerly Iowa Administrative Code rule 621—6.4. We will refer to the rule by its current number throughout this opinion.

21 together, upheld the validity of the agency rule and granted summary judgment dismissing the union's enforcement action. The union appealed, and we retained the appeal.

On our review, for the reasons explained below, we hold PERB acted within its statutory authority in promulgating rule 621—6.5(3), which has the force of law. The legislature expressly granted PERB rulemaking and interpretive authority. Chapters 20 and 21 are interrelated and must be construed together. Rule 621—6.5 implements ratification voting requirements for both the Board and the union. The district court correctly applied rule 621—6.5(3) to hold the parties had no enforceable collective bargaining agreement without the Board's vote to ratify it. Accordingly, we affirm the summary judgment dismissing this action.

## I. Background Facts and Proceedings.

Service Employees International Union, Local 199 (SEIU) represents approximately 3500 employees of the State of Iowa who work at the University of Iowa Hospitals and Clinics (UIHC). The UIHC is governed by the Iowa Board of Regents. Iowa Code § 262.7(1). The Board consists of nine members appointed by the Governor. *Id.* §§ 262.1–.2. The Board meets periodically to "adopt[] rules and policies having general application to the institutions subject to its governance," including the UIHC. Iowa Admin. Code r. 681—11.1(5); *see also* Iowa Code § 262.9(3). The Board, when acting as a public employer, has discretion to retain attorneys to "carry[] out collective bargaining and related responsibilities provided for under chapter 20." Iowa Code § 262.9(16). The Board is subject to the open-meetings requirements of Iowa Code chapter 21. *Id.* §§ 21.2(1)(*a*), .3.

SEIU and the Board negotiated voluntary two-year collective bargaining agreements in 2009, 2011, and 2015.[2] In each of those years, the Board formally voted to approve the collective bargaining agreement after the ratification vote by SEIU's membership. The agreement negotiated in 2015 expired by its terms on June 30, 2017.

In the fall of 2016, the Board and SEIU began negotiating a new agreement to begin on July 1, 2017. SEIU selected James "Jim" Jacobson as its lead negotiator, and the Board chose Michael Galloway as its lead negotiator. Jacobson and Galloway met on October 10, 2016, to discuss a timeline for the upcoming exchange of offers and ensuing negotiations. The Board met on October 20 and went into a closed session to discuss collective bargaining strategy with counsel and institutional representatives. The Board did not vote to approve any bargaining agreement during this closed session.

On November 29, Jacobson and Galloway exchanged initial bargaining proposals. They met again on December 8 and 14 to discuss the initial proposals and exchange additional proposals. At the December 14 meeting, Jacobson presented SEIU's counteroffer. Galloway made clear to Jacobson that any terms they set at the bargaining table would have to be approved by the Board and that Galloway would have to "sell it" to the Board. Galloway canceled bargaining sessions scheduled for January 5 and 12, 2017.

On January 9, Galloway copied Jacobson on an email to the PERB reporting the status of the parties' negotiations. Galloway's email explained that the Board would soon be extending its final offer:

---

[2]During the negotiations for the 2013 contract, the parties reached an impasse that was resolved through binding arbitration. *See* Iowa Code § 20.22.

We will be giving the union a final offer in writing this week. Jim is correct that we cancelled the 5th so that I could visit with the Board and the hospital regarding my financial authority. I am having surgery on the 11th so I can't make the 12th.

Our final offer will contain all the financial authority I will have. If it is not acceptable, then we should just schedule mediation. Thanks[.]

On January 10, Galloway emailed Jacobson and attached the Regents' final offer accompanied by this explanation:

Please find attached the Board of Regents' final offer to SEIU. The offer includes all the items we had agreed previously upon during negotiations. I believe this offer represents a substantial increase to the inpatient nurses and is a fair offer to the other members of the bargaining unit. This offer contains all the financial authority we have from the Board of Regents. Please let us know if this offer is acceptable.

If the offer is not acceptable, we will need to schedule mediation during the week of January 30th.

The cover page of the January 10 offer stated, "This is a package proposal and must be accepted or rejected in its entirety." Yet the cover page also noted, "The [Board] reserves the right to add to, delete from, and/or revise this proposal."

On January 17, Jacobson called Galloway to ask whether better terms were available on the Weekend Option Program for nurses and a probationary period for new employees. The next day, Jacobson followed up by email to ask if Galloway had spoken to the Board about those matters. Galloway responded that he did "not have a response." However, Galloway foreshadowed headwinds for the Board's ultimate approval of the pending proposal:

I know UIHC would be much more comfortable leaving the probationary status current contract and maintaining our position on weekend option. That being said, the biggest issue now is that the Regents have heard rumors regarding the position AFSCME has taken with the State. It is my understanding that the Union's offer was dramatically lower than 2% and increased the insurance contributions.

I understand these are different units, but there will be grave concerns regarding our offer once it is received/understood by the Governor's office. I knew this could become an issue and was hoping to avoid it by getting this contract completed quickly.

On January 25, Jacobson emailed Galloway to inform him SEIU had accepted the Regents' final offer, stating,

I left you a voicemail earlier today. But I thought I better put it in writing. SEIU has agreed to the terms of the [Board]'s final offer sent via email on January 10, 2017.

SEIU will hold a ratification vote as quickly as possible and let you know the results.

Please contact me regarding drafting a final, clean version of the document.

On January 31, Galloway spoke with Jacobson on the phone and "informed him that there was not an agreement to be ratified and that the parties need[ed] to continue to bargain." Galloway did not expressly withdraw the Board's January 10 offer. On February 1, Jacobson sent Galloway an email clarifying SEIU's position,

In light of our conversation yesterday, I wanted to recap the situation in which SEIU, as the legal representatives of approximately 3,500 health care professionals, and the Board of Regents find themselves.

On January 10, 2017 you sent SEIU, as the chief negotiator for the Board of Regents, a final contract offer.

On January 25, 2017, SEIU accepted the offer with both a voice message and an email message.

On January 31, during a telephone conversation, you and Tim Cook informed me that the Board of Regents believed the parties had not, in fact, reached an agreement.

As I said yesterday, SEIU plans to hold its ratification vote in the very near future. I will inform you of the results.

Please let me know if the Board of Regents' position changes.

On February 8, Jacobson emailed Galloway to inform him of SEIU's ratification vote,

SEIU, Local 199 ratified the tentative agreement the parties reached on January 25, 2017. The vote was held February 7,

2017 with 98.6 percent of the voters in favor of accepting the agreement. Please let me know if you have any questions.

On February 9, House File 291 was introduced in the Iowa House of Representatives. H.F. 291, 87th G.A., 1st Sess. (Iowa 2017). House File 291 made significant amendments to PERA by substantially limiting the number of mandatory bargaining topics for most public employees, including the employees in SEIU's bargaining units. The Governor signed House File 291 into law on February 17, and the amendments took effect immediately.[3] 2017 Iowa Acts ch. 2 (codified in part at Iowa Code ch. 20 (2018)).

Although the Board had publicly voted to approve the collective bargaining agreements after SEIU's ratification votes in 2009, 2011, and 2015, the Board held no such vote to approve the 2017 agreement. The Board met on March 8 to discuss and vote to accept a collective bargaining agreement with the faculty union of the University of Northern Iowa. The Board did not consider or approve the SEIU agreement at this meeting.

On March 10, SEIU filed this action in district court pursuant to Iowa Code section 20.17(5) to enforce the collective bargaining agreement. SEIU alleged that the terms in the Board's January 10 offer became a valid collective bargaining agreement upon SEIU's ratification vote. The Board filed a preanswer motion to dismiss, contending that no valid collective bargaining agreement existed to enforce under section 20.17(5). The Board relied on the rule promulgated by PERB that requires a public employer to accept or reject a tentative agreement before the agreement becomes effective. Iowa Admin. Code r. 621—6.5(3). The Board argued the court lacked subject matter jurisdiction without a contract to enforce.

---

[3]The amendments invalidated collective bargaining agreements still under negotiation. *See* H.F. 291, 87th G.A., 1st Sess. § 25 (Iowa 2017) (providing that collective bargaining agreements not completed by that date "shall not become effective").

SEIU resisted the motion to dismiss, arguing rule 621—6.5(3) is invalid and that the agreement became effective when ratified by vote of the union's members under Iowa Code section 20.17(4). The district court denied the Board's motion to dismiss, concluding the court had subject matter jurisdiction to determine whether the parties entered into an enforceable agreement.

The Board and SEIU filed cross-motions for summary judgment. The Board relied on rule 621—6.5(3). SEIU argued the Board's offer was never withdrawn and that rule 621—6.5(3) is invalid because it added a requirement of a vote by the public employer that is not imposed by the controlling statute, Iowa Code section 20.17(4). The district court rejected SEIU's challenge to the validity of rule 621—6.5(3). The district court noted the Board is subject to the open-meetings and public-voting requirements of Iowa Code chapter 21 and that section 20.17(4) contains no language divesting the Board "of the ability to meet and approve a contract that is negotiated by its representative and the union. PERB's rule merely spells out when and how that will occur." The court concluded PERB had the statutory authority to promulgate rule 621—6.5(3). The district court applied that rule to grant summary judgment in favor of the Board stating, "Because the Board of Regents did not approve the tentative contract, there is no executed contract." The district court denied SEIU's motion for enlarged findings and dismissed SEIU's petition. SEIU appealed the district court ruling, and we retained the appeal.

## II. Scope of Review.

We review a summary judgment ruling for correction of errors at law. *Peak v. Adams*, 799 N.W.2d 535, 542 (Iowa 2011). "Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Emp'rs Mut.*

*Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012). "We view the evidence in the light most favorable to the nonmoving party." *Luana Sav. Bank v. Pro-Build Holdings, Inc.*, 856 N.W.2d 892, 895 (Iowa 2014). "The court must consider on behalf of the nonmoving party every legitimate inference that can be reasonably deduced from the record." *Thornton v. Am. Interstate Ins.*, 897 N.W.2d 445, 460 (Iowa 2017) (quoting *McIlravy v. N. River Ins.*, 653 N.W.2d 323, 328 (Iowa 2002)).

### III. Analysis.

We must decide whether the district court erred by granting the Board's motion for summary judgment dismissing SEIU's petition to enforce the 2017 collective bargaining agreement. The fighting issue is the validity of Iowa Administrative Code rule 621—6.5(3). We conclude the district court correctly ruled PERB had the statutory authority to promulgate rule 621—6.5(3) and properly granted summary judgment dismissing SEIU's action to enforce a contract the Board never voted to approve.

The legislature empowered PERB to adopt rules as the agency deems necessary to carry out the purposes of chapter 20. Iowa Code § 20.6(5). The validity of an agency rule is a question of law. *City of Des Moines v. Iowa Dep't of Transp.*, 911 N.W.2d 431, 440–41 (Iowa 2018). "Ordinarily, state agency rules are given 'the force and effect of law.' " *Id.* at 440 (quoting *Stone Container Corp. v. Castle*, 657 N.W.2d 485, 489 (Iowa 2003)). The "rule is 'presumed valid unless the party challenging the rule proves a "rational agency" could not conclude the rule was within its delegated authority.' " *Id.* at 439 (quoting *Meredith Outdoor Advert., Inc. v. Iowa Dep't of Transp.*, 648 N.W.2d 109, 117 (Iowa 2002)). "[T]he power of the agency is limited to the power granted by statute." *Id.* (quoting *Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 533 (Iowa 2017)). "Thus, if the

rules adopted by the agency 'exceed the agency's statutory authority, the rules are void and invalid.' " *Id.* at 441 (quoting *Wallace v. Iowa State Bd. of Educ.*, 770 N.W.2d 344, 348 (Iowa 2009)).

"We do not defer to the agency's interpretation of its own statutory authority to issue a rule unless 'the legislature has clearly vested that interpretation in the agency.' " *Id.* at 439 (quoting *Brakke*, 897 N.W.2d at 533)). We recently invalidated the department of transportation's rules regulating placement of automated traffic enforcement equipment on interstate highways because that agency lacked the statutory authority to promulgate such rules. *Id.* at 450. We noted the legislature had not given that agency interpretive authority. *Id.* at 439.

By contrast, the legislature in 2010 "amend[ed] Iowa Code section 20.6 to expressly grant PERB authority to '[i]nterpret, apply, and administer' the provisions of Iowa Code chapter 20." *AFSCME Iowa Council 61 v. Iowa Pub. Emp't Relations Bd.*, 846 N.W.2d 873, 878 (Iowa 2014) (quoting 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011))). Accordingly, we give deference to PERB's interpretation of chapter 20 as to its statutory authority to promulgate rule 621—6.5 and will uphold PERB's interpretation unless it is "irrational, illogical, or wholly unjustifiable." *Id.* (quoting Iowa Code § 17A.19(10)(*l*) (2013)).

Although PERB is not a party to this case, SEIU may challenge the validity of rule 621—6.5(3) in this action. *Jew v. Univ. of Iowa*, 398 N.W.2d 861, 864 (Iowa 1987) ("A party aggrieved by application of an administrative rule may challenge its validity in an independent action where the rule is sought to be applied.").

Rule 621—6.5(3) provides,

> **6.5(3)** *Acceptance or rejection by public employer.* The public employer shall, within ten days of the tentative agreement, likewise meet to accept or reject the agreement,

and shall within 24 hours of the acceptance or rejection serve notice on the employee organization of its acceptance or rejection of the proposed agreement; however, the public employer shall not be required to either accept or reject the tentative agreement if it has been rejected by the employee organization.

Iowa Admin. Code r. 621—6.5(3).  The ten-day deadline does not apply to the Iowa Board of Regents.  *Id.* r. 621—6.5(4)(*b*).

PERB amended and reenacted Iowa Administrative Code chapter 6 in 2016, including rule 621—6.4(3) (now renumbered to 621—6.5(3)).[4]  At that time, PERB had express interpretive authority from the 2010 amendments to Iowa Code section 20.6.  *See* Iowa Code § 20.6(1) (2016)) (noting that PERB shall "[i]nterpret, apply, and administer" Iowa Code chapter 20).

SEIU's challenge to rule 621—6.5(3) is straightforward.  SEIU argues this rule is invalid because it adds a requirement for ratification by Board vote that is not found in the controlling statute, which provides,

> The terms of a proposed collective bargaining agreement shall be made available to the public by the public employer and reasonable notice shall be given to the public employees by the employee organization prior to a ratification election.  The collective bargaining agreement shall become effective only if ratified by a majority of those voting by secret ballot.

Iowa Code § 20.17(4) (2017).

---

[4]The amendments to Iowa Administrative Code rule 621—6.4(3) were as follows, with additions underlined and removals crossed out:

> **6.4(3)** *Acceptance or rejection by public employer.*  The public employer shall, within ten days of the tentative agreement, likewise meet to accept or reject the agreement, and shall within 24 hours of the acceptance or rejection serve notice on the employee organization of its acceptance or rejection of the proposed agreement; provided, however, that the public employer shall not be required to either accept or reject the tentative agreement if it has been rejected by the employee organization.

38 Iowa Admin. Bull. 1046, 1048 (Dec. 9, 2015) (effective Jan. 13, 2016).

PERB necessarily construed section 20.17(4) to permit rule 621—6.5(3), the rule promulgated by the agency to implement that Code section. Under our standard of review, we will not reverse PERB's interpretation unless it is "irrational, illogical, or wholly unjustifiable." *AFSCME Iowa Council 61*, 846 N.W.2d at 878 (quoting Iowa Code § 17A.19(10)(*l*)). Under this deferential standard of review, we decline to reverse PERB's statutory interpretation. We reject SEIU's conflicting interpretation.

Section 20.17(4) expressly requires the union to ratify the proposed collective bargaining agreement without requiring a ratification vote by the public employer. SEIU's challenge is facially compelling if the statute is read in isolation. But SEIU's myopic focus on that provision alone must yield to our requirement to read related statutes together and harmonize them if possible. *See* Iowa Code § 4.7 ("If a general provision conflicts with a special or local provision, they shall be construed, if possible, so that effect is given to both. If the conflict between the provisions is irreconcilable, the special or local provision prevails as an exception to the general provision."); *Kolzow v. State*, 813 N.W.2d 731, 736 (Iowa 2012) ("If more than one statute relating to the subject matter at issue is relevant to the inquiry, we consider all the statutes together in an effort to harmonize them." (quoting *State v. Carpenter*, 616 N.W.2d 540, 542 (Iowa 2000)). Our broader analysis shows the rule does not create a new public employer voting requirement omitted from the Iowa Code. To the contrary, rule 621—6.5(3) merely implements statutory voting requirements found in related Code sections for unions and public employers alike.

Both chapter 20 and chapter 21 govern public employers. As the district court correctly concluded, the Board is subject to the open-meetings and public-voting requirements of Iowa Code chapter 21. Iowa Code §§ 21.2(1)(*a*), .3; *id.* § 262.8. "Final action [by the Board] on any

matter shall be taken in an open session unless some other provision of the Code expressly permits such actions to be taken in closed session." *Id.* § 21.5(3). Final action includes approval of employment contracts with public employees. *See Hutchison v. Shull,* 878 N.W.2d 221, 237 (Iowa 2016) (holding county board's deliberations on employee reorganization plan were subject to chapter 21 open-meetings requirements). The statutes are linked by the cross-reference in section 20.17(3), which provides that certain negotiation and strategy discussions may be conducted in closed session while chapter 21's open-meetings requirements apply to other aspects of collective bargaining.[5]

Contracts with public entities are unenforceable when executed without proper approval or compliance with statutory requirements. *City of Akron v. Akron Westfield Cmty. Sch. Dist.*, 659 N.W.2d 223, 225–27 (Iowa 2003) (per curiam) (holding contract with city is void without formal vote required by statute); *City of McGregor v. Janett,* 546 N.W.2d 616, 620 (Iowa 1996) ("This court has long held that acts by individual members of a public body . . . [are not binding] unless officially sanctioned in accordance with the statute."); *see also Hutchison,* 878 N.W.2d at 237–38 (noting "Iowa

---

[5]Section 20.17(3) provides,

Negotiating sessions, strategy meetings of public employers, mediation, and the deliberative process of arbitrators shall be exempt from the provisions of chapter 21. However, the employee organization shall present its initial bargaining position to the public employer at the first bargaining session. The public employer shall present its initial bargaining position to the employee organization at the second bargaining session, which shall be held no later than two weeks following the first bargaining session. Both sessions shall be open to the public and subject to the provisions of chapter 21. Parties who by agreement are utilizing a cooperative alternative bargaining process may exchange their respective initial interest statements in lieu of initial bargaining positions at these open sessions. Hearings conducted by arbitrators shall be open to the public.

Iowa Code § 20.17(3).

Code section 21.6(3)(*c*) allows the district court to void any action taken by the board" and directing district court on remand to consider whether subsequent board approval vote "cured any violation of the open meetings law").

"The open meetings law is intended to safeguard free and open democracy by ensuring the government does not unnecessarily conduct its business in secret." *Hutchison,* 878 N.W.2d at 237. Requiring public, open votes to approve government contracts serves that goal. Formal contract approval requirements also protect taxpayers. *City of Akron,* 659 N.W.2d at 225. "[I]t would be a bad idea to frustrate those requirements." *Id.* at 225–26. Those who negotiate or enter into contracts with government entities are charged with knowledge of the requirements of a public vote. *See id.* at 225.

Against this backdrop, we conclude the district court correctly determined that PERB acted within its statutory authority by promulgating rule 621—6.5 to implement public-voting requirements for the Board, as codified in chapter 21, as well as the union membership secret-voting requirements, as codified in section 20.17(4).[6] The district court reasoned,

---

[6]The rule implements the union voting requirement as follows:

> **6.5(2)** *Ratification or rejection by employee organization.* Within seven days of the date of the tentative agreement, the employee organization shall conduct a ratification election on the tentative agreement. The employee organization shall give reasonable notice of the date, time and place of the election to the public employees; however, such notice shall be at least 24 hours prior to the election. The vote shall be by secret ballot, and the majority of votes cast will determine acceptance or rejection of the tentative agreement. Only members of the employee organization shall be entitled to vote; however, the employee organization may, pursuant to its internal procedures, extend voting rights to nonmember bargaining unit employees. The employee organization shall, within 24 hours of the conclusion of the election, serve notice on the public employer as to whether or not the proposed agreement has been ratified.

15

> [P]ublic boards and commissions are required to provide notice to the public and meet before voting on any action within the scope of its duties. *See generally* Iowa Code ch. 21. Section 20.17 does not contain any language to suggest that a public body divests itself of the ability to meet and approve a contract that is negotiated by its representative and the union. PERB's rule merely spells out when and how that will occur.

We agree with the district court's analysis. We reject SEIU's argument that rule 621—6.5(3) adds a statutory requirement contrary to section 20.17(4). Section 20.17(4) expressly requires a union vote because no other statute does so. Section 20.17(4) is silent regarding a ratification vote by the public employer because that requirement is codified in chapter 21. *Cf. Gannon v. Bd. of Regents*, 692 N.W.2d 31, 39–44 (Iowa 2005) (holding that a private corporation exercising authority delegated by the Board of Regents was performing a government function and was therefore subject to the open-records requirements of Iowa Code chapter 22). Nothing in section 20.17(4) eliminates the Board's duty to comply with chapter 21 when entering into employment contracts.

The parties' course of conduct with earlier collective bargaining agreements reflects the requirements of chapter 21 and rule 621—6.5(3). The Board voted to ratify the collective bargaining agreements negotiated with SEIU in 2009, 2011, and 2015. Galloway told Jacobson in December 2016 that he would have to "sell" any proposed new contract to the Board. The Board never voted to approve the proposed agreement ratified by the members of SEIU, and Galloway reiterated that there was no enforceable agreement in his discussions with Jacobson on January 31, 2017. Meanwhile, on March 8, as required under chapter 21 and rule 621—6.5(3), the Board voted to approve a separate collective bargaining agreement with the faculty union at the University of Northern Iowa. Galloway provided this uncontroverted testimony:

> Throughout my practice, I have served as the chief negotiator in collective bargaining for a variety of public employers on more than 400 occasions. In this capacity, I am not aware of a single voluntary collective bargaining agreement reached involving a public employer with a governing body that was not conditioned upon a ratification vote by that governing body.

PERB promulgated rule 621—6.5(3) in 1976. The rule has withstood the test of time. The legislature in the subsequent four decades has taken no action to invalidate this rule. "We consider the legislature's inaction as a tacit approval of the [agency's] action." *Lowe's Home Ctrs., LLC v. Iowa Dep't of Revenue*, 921 N.W.2d 38, 48 (Iowa 2018) (alteration in original) (quoting *City of Sioux City v. Iowa Dep't of Revenue & Fin.*, 666 N.W.2d 587, 592 (Iowa 2003)).[7]

We hold rule 621—6.5(3) is valid and entitled to the force of law. SEIU has failed to show PERB exceeded its statutory authority by promulgating this rule. The district court correctly applied that rule in granting the Board's motion for summary judgment. No enforceable agreement was reached without the requisite vote by the Board to approve the proposed collective bargaining agreement.[8]

**IV. Disposition.**

For those reasons, we affirm the district court's summary judgment dismissing SEIU's action to enforce the collective bargaining agreement.

**AFFIRMED.**

---

[7]The Iowa Court of Appeals acknowledged the validity of rule 621—6.5(3) (previously 621—6.4(3)) in dicta nearly three decades ago. *Moravia Cmty. Sch. Dist. v. Moravia Educ. Ass'n*, 460 N.W.2d 172, 178 (Iowa Ct. App. 1990) (noting under rule 621—6.4 the union and the public employer each "has the right to accept or reject the tentative agreement").

[8]The district court also correctly rejected SEIU's alternative argument that the agreement was approved by operation of law when the Board failed to vote to affirmatively reject the agreement within ten days of the union's ratification vote. As noted, the ten-day deadline does not apply to the Board as an arm of the State. Iowa Admin Code r. 621—6.5(4)(*b*).

Mansfield, Christensen, and McDonald, JJ., join this opinion. Cady, C.J., files a dissenting opinion in which Wiggins, J., joins. Appel, J., files a separate dissenting opinion in which Wiggins, J., joins.

**CADY, Chief Justice (dissenting).**

I respectfully dissent.

The legislature enacted the open-meetings law to safeguard openness and transparency in government and to ensure that the business of government is not done in secret. *Hutchison v. Shull*, 878 N.W.2d 221, 237 (Iowa 2016). It did not enact this law to change or alter long-standing common law principles that permit negotiations by agents of entities operated by boards to enter into binding agreements prior to final board approval. *See Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 100 (Iowa 2011). Of course, the legislature did modify this principle with respect to collective bargaining agreements involving the state, in part, by requiring the union membership to approve a negotiated agreement before it can be binding on the union, but did not similarly require board approval. *See* Iowa Code § 20.17(4) (2017). Thus, the Public Employment Relations Board had no authority to exercise its rulemaking powers over collective bargaining by using the provisions of the open-meetings law to alter contract law by requiring Board of Regents approval of negotiated collective bargaining agreements. The administrative rule is clearly invalid and does not govern the outcome of this case. The district court erred in concluding otherwise.

Instead, the legal issue in this case is whether the Board intended their agent to reach a binding agreement subject to a union vote. The evidence in the case indicates the State did not intend to be bound by its agent. The evidence reveals the State relied on the invalid administrative rule and never intended to be bound by the negotiations until final Board approval. Thus, even though the rule was invalid, it helped formulate the state of mind of the parties and ultimately the outcome of this case.

Nevertheless, this case cannot be affirmed on this ground. The issue was never raised and decided. Accordingly, I would reverse the decision of the district court and remand the case for further proceedings.

Wiggins, J., joins this dissent.

#18–0018, *Serv. Emps. Int'l Union, Local 199 v. State*

**APPEL, Justice (dissenting).**

I view the issues in this case differently than the majority. Application of ordinary rules of statutory interpretation, administrative law, and summary judgment compel the conclusion that the district court erred in granting summary judgment.

**I.  Overview of Issues.**

The first question we must confront is whether Iowa Code chapter 20 permits a public employer to empower its representative to make a binding offer.  I answer that question in the affirmative because the statute provides that a "public employer may designate any individual as its representative to engage in collective bargaining negotiations."  Iowa Code § 20.17(2) (2017).  The common meaning of the term "negotiations," other jurisdictions' understanding of the term, and other provisions in Iowa Code chapter 20 all indicate that authority to engage in negotiations includes the authority to make a binding offer.

Moreover, the Iowa Board of Regents (Regents) is specifically authorized to employ an attorney or counselor for "carrying out collective bargaining and related responsibilities."  *Id.* § 262.9(16).  To "carry out" means, among other things, "to continue to an end or stopping point." *Carry out*, *Webster's Third New International Dictionary* (unabr. ed. 2002) [hereinafter *Webster's*].  This provision further corroborates that the Regents may empower their designated representative to make a binding offer.

The next issue we must tackle is the validity of an administrative rule that disables public employers from empowering their representatives to make binding offers.  Iowa Admin. Code r. 621—6.4(3) (2016).  The rule so disables public employers because it requires the employers to meet in

order to accept or reject a "tentative" agreement before the agreement may become binding. *Id.*

The Iowa Administrative Procedure Act (IAPA) instructs that, where agency action based on statutory interpretation is under judicial review, our standard of review depends on whether the agency has clearly been vested with interpretive authority over the interpreted statutory provisions. Iowa Code § 17A.19(10)(*c*), (*l*). If there is such clear vesting, then our standard of review includes some deference to the agency interpretation; if not, then we do not defer. *Id.* Importantly, our standard of review must be "applied to the agency action at the time that action was taken." *Id.* § 17A.19(8)(*b*); *see Brummer v. Iowa Dep't of Corr.*, 661 N.W.2d 167, 168 n.1 (Iowa 2003) (explaining that under section 17A.19(8)(*b*), "we must focus on the agency's actions during the time period in which" the agency took the challenged action).

The Public Employment Relations Board (PERB) promulgated the rule containing the employer ratification requirement. "[A]t the time that action was taken"—when PERB enacted the rule in 1975 and the three times during 1976 to 1982 PERB necessarily interpreted statutory provisions to substantively modify the employer ratification requirement— PERB lacked interpretive authority over both chapter 20 and the statutory provisions in question. Consequently, we review PERB's rule for corrections of error at law and are free to substitute our de novo interpretation of the statute. Iowa Code § 17A.19(10)(*c*); *Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 11–14 (Iowa 2010).

The majority opinion in this case defers to PERB's statutory interpretation based on a 2010 express grant of interpretive authority. That approach is wrong. During the time that the grant of interpretive authority was in existence, PERB did not interpret any provision of chapter

20 to modify the employer ratification requirement. Indeed, PERB did not even modify the requirement during that time. Thus, no one is seeking to apply to Service Employees International Union, Local 199 (SEIU), and the union is not challenging, any PERB action or statutory interpretation made while the express grant was in force.

The majority points to 2015 amendments promulgated by PERB. *See* 38 Iowa Admin. Bull. 1046, 1048 (Dec. 9, 2015). But, according to PERB, the 2015 changes were "nonsubstantive amendments" to the public *notification* requirement also located in rule 6.4. *Id. The 2015 amendment did not modify the employer ratification requirement and did not require statutory interpretation.* Indeed, the 2015 amendments were expressly pursuant to PERB's rulemaking, not interpretive, authority. *Id.*

Deference is only granted under Iowa Code section 17A.19(10)(*l*) to an agency action that is both (i) based on statutory interpretation and (ii) prejudicial to the substantial rights of the person seeking judicial relief. The 2015 amendments satisfy neither requirement.

Under the IAPA, we must apply our standard of review "to the agency action at the time that action was taken." Iowa Code § 17A.19(8)(*b*). The agency actions at issue in this case occurred during 1975 to 1982, when PERB had no interpretive authority over chapter 20 or the provisions in question. Consequently, no deference is warranted.

Applying our standard of review, I believe PERB's employer ratification requirement is erroneous and therefore invalid. The requirement is contrary to a public employer's ability to empower a representative to make a binding offer inherent to the statutory authority to designate a representative to negotiate. *Id.* § 20.17(2). The rule is also contrary to the statutory authorization for the Regents to employ an attorney to "carry[] out collective bargaining and related responsibilities."

*Id.* § 262.9(16). Additionally, the rule conflicts with Iowa Code section 20.17(4), which only requires union ratification. We are bound by what the legislature actually said, not what it might have said. *Krull v. Thermogas Co. of Northwood*, 522 N.W.2d 607, 612 (Iowa 1994).

Unlike the majority opinion in this case, I do not believe that the validity of PERB's rule depends on Iowa's open-meetings law. Negotiations are specifically exempted from compliance with the requirements of the open-meetings law. Iowa Code § 20.17(3). Also, the more specific statutory provisions governing collective bargaining in Iowa Code sections 20.17(2)–(4) and 262.9(16) should control over the more general open-meetings law governing myriad agency action in Iowa Code chapter 21. *See id.* § 4.7; *Rilea v. Iowa Dep't of Transp.*, 919 N.W.2d 380, 388 n.6 (Iowa 2018). And besides, the goals of the open-meetings requirement are already accomplished by a requirement to make the collective bargaining agreement public, Iowa Code § 20.17(4); a formalistic ritual to adopt the terms does nothing further.

To be clear, this case does not ask us to determine whether it is inappropriate for a public employer to demand an approval opportunity at an open meeting before a binding collective bargaining agreement may be formed. No one contends that any provision of chapter 20 *requires* an employer to empower a designated representative to make binding offers. Thus, prior collective bargaining negotiations may have involved employer ratification, but the factual circumstances in those historical negotiations do not resolve the legal question before us. The legal question before us is whether an employer *may* empower its designated representative to make binding offers which do not necessitate employer ratification. Sections 20.17(2), 20.17(4), and 262.9(16) say yes, while the administrative rule

says no. Our task is to determine whether the administrative rule is valid, and I do not believe it is.

With a proper understanding of the law governing this case—a public employer may empower a designated representative to make a binding offer in collective bargaining negotiations—we must determine if there is a genuine dispute on whether the Regents' designated representative, Michael Galloway, made a binding offer. The Regents may not have intended to authorize Galloway to make a binding offer because of their reliance on the invalid rule. But they did not present this argument to the district court. Likewise, the district court did not grant summary judgment on that basis. Instead, the Regents argued, and the district court agreed, that the Regents could not have so authorized Galloway because of the rule. The reasoning presented by the Regents and adopted by the district court falters because the rule was invalid. And since we cannot affirm a grant of summary judgment on a basis that was not presented to and considered by the district court, s*ee Lamasters v. State*, 821 N.W.2d 856, 864 (Iowa 2012); *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002), I conclude that SEIU should survive summary judgment on this point

Finally, there are two issues associated with revocation of the January 10 offer after SEIU indicated it agreed to the terms but before the union membership voted to ratify it. The first issue is legal and regards whether a public employer's collective bargaining negotiator may revoke a binding offer after the union indicates its acceptance but before the union ratifies the proposed agreement. We need not answer that legal question in this case, however, because SEIU survives summary judgment even if the Regents can revoke under such circumstances.

The record shows either that it is undisputed that the Regents did not revoke the offer or, at least, that there is a genuine dispute on whether the Regents revoked. The district court found it undisputed that the January 10 letter was not revoked. In support, the district court noted that SEIU's representative asserted by affidavit that the Regents' representatives did not expressly revoke the January 10 offer, and the Regents' representatives did not dispute the statement in their affidavits.

Even putting aside the Regents' failure to dispute SEIU's assertion, I think a reasonable fact finder could conclude that the Regents' representative did not revoke the January 10 offer. Viewing the record in the light most favorable to SEIU, the nonmoving party, Galloway stated on January 31 that the Regents did not believe the parties had reached an agreement. Whether that statement amounts to a revocation is a factual question that is inappropriate for us to resolve on summary judgment. A reasonable fact finder, it seems to me, could credit SEIU's testimony and thereby believe that Galloway's ambiguous statement only amounted to an indication that the union members had not yet ratified the agreement. Moreover, as the majority opinion in this case points out, Galloway did not expressly revoke the January 10 offer.

Therefore, I would vacate the grant of summary judgment and remand to the district court. Accordingly, I respectfully dissent. Below are the granular details.

**II. Whether Iowa Code Chapter 20 Permits a Public Employer's Negotiator to Make a Binding Offer.**

The first question we must answer is whether a public employer engaged in collective bargaining can delegate to its designated representative the power to make a binding offer. Prior to the enactment of the Public Employees Relations Act of 1974, 1974 Iowa Acts ch. 1095,

§ 17, the answer to that question may have been no. *See State Bd. of Regents v. United Packing House Food & Allied Workers, Local No. 1258*, 175 N.W.2d 110, 113 (Iowa 1970) (explaining that the Board of Regents can meet with union representatives without improperly delegating legislative powers to private persons because the final decision remains in the Board of Regents); *see also Serv. Emps. Int'l Local No. 55 v. Cedar Rapids Cmty. Sch. Dist.*, 222 N.W.2d 403, 408–09 (Iowa 1974) (stating that as a result of a school district's long-standing procedure, a union "knew or had reason to know the school board had the ultimate authority and power to accept, reject or modify any and all demands or requests made by the representatives of the Union" and further that "[a]s a matter of fact," it was "understood . . . that the negotiations with representatives of the School District were only a part of the process by which the school board makes its final policy determination with regard to the wages and working conditions of the custodial and maintenance employees").

The Public Employment Relations Act of 1974, however, commenced the comprehensive statutory regulation of public employer collective bargaining. *See* Lawrence E. Pope, *Analysis of the Iowa Public Employment Relations Act*, 24 Drake L. Rev. 1, 2 (1974). The Act authorizes a public employer to "designate any individual as its representative to engage in collective bargaining negotiations." Iowa Code § 20.17(2). That language does not qualify the public employer's authority to empower a representative in negotiations. The question then becomes whether authority to engage in negotiations includes the authority to make a binding offer.

"Our ultimate goal in interpreting statutes is to determine and give effect to legislative intent." *Holiday Inns Franchising, Inc. v. Branstad*, 537 N.W.2d 724, 728 (Iowa 1995). "[W]e interpret statutes consistent with

their normal meaning" and refrain from a strained interpretation. *State v. Boggs*, 741 N.W.2d 492, 502 (Iowa 2007).

As discussed below, I believe negotiations can include binding offers. Therefore, the statute allows a public employer to empower its designated representative to make a binding offer.

The term "negotiations" is not defined in chapter 20. *See* Iowa Code § 20.3. "[W]hen the legislature has not defined a term, we look to the common meaning of that term in interpreting the statute." *State v. Tesch*, 704 N.W.2d 440, 451 (Iowa 2005). We may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage. *Id.*; *Bernau v. Iowa Dep't of Transp.*, 580 N.W.2d 757, 761 (Iowa 1998).

The common meaning of negotiate includes the ability to make a binding offer. According to *Webster's*, the term "negotiate" means "to communicate or confer with another so as to arrive at the settlement of some matter" and to "meet with another so as to arrive through discussion at some kind of agreement or compromise about something." *Negotiate*, *Webster's*. Similarly, *Black's* defines "negotiation" as "[a] consensual bargaining process in which the parties attempt to reach agreement on a disputed or potentially disputed matter. Negotiation usu[ally] involves complete autonomy for the parties involved, without the intervention of third parties." *Negotiation*, *Black's Law Dictionary* (10th ed. 2014). Those definitions connote an ability to make a binding offer, because otherwise, negotiating would not arrive at settlement or compromise. More pointedly, the definitions do not exclude binding offers.

That natural meaning of negotiations—as including, or not excluding, the ability to make a binding offer—is corroborated by other jurisdictions' understanding of the term. "[T]he word 'negotiating' . . . is a

general word coming to us from the Latin, and signifying to carry on negotiations concerning and so to conduct business, *to conclude a contract,* or to transfer or arrange." *Newport Nat'l Bank v. Bd. of Educ.*, 70 S.W. 186, 186 (Ky. Ct. App. 1902) (emphasis added). "The word 'negotiate' does not merely mean haggling over and changing contract terms. To negotiate also means to 'procure agreement' by means of discussion." *Abbate v. Abbate,* 441 N.Y.S.2d 506, 516 (App. Div. 1981). "Where, as here, certain terms have been established which would result in settlement, negotiate means more than merely talking to the opposing party. It means to settle if the specified terms have been met." *Shields v. Keystone Cogeneration Sys., Inc.*, 620 A.2d 1331, 1334 (Del. Super. Ct. 1992). "Negotiations occur only where there exists an opportunity for an offeror to modify or revise its proposal." *Drexel Heritage Furnishings, Inc. v. United States*, 7 Cl. Ct. 134, 154 (Cl. Ct. 1984). A federal regulator defined the term "negotiations" as "a series of offers and counter-offers until a mutually satisfactory agreement is concluded by the parties." *Airco, Inc. v. Energy Research & Dev. Admin.*, 528 F.2d 1294, 1298 (7th Cir. 1975) (quoting *To Murray Schaffer,* 51 Comp. Gen. 479, 480 (1972)). An Oklahoma court believes that the ordinary meaning of negotiate

> is to "bargain with another respecting a purchase and sale" . . . in an effort to consummate a sale. In other words there must be conduct that places one in the position of bargaining with a party to settle the terms . . . ordinarily on behalf of one party or the other.

*Loyd v. Saffa,* 719 P.2d 844, 847 (Okla. Ct. App. 1986) (quoting *Black's Law Dictionary* 934 (5th ed. 1979)), *overruled on other grounds by Commodore Home Sys., Inc. v. Citicorp Acceptance Co.*, 780 P.2d 674, 678 (Okla. 1989). The Maine Supreme Judicial Court explained that unless extrinsic evidence suggests a contrary meaning, "the term 'negotiating' . . .

means a dialogue aimed at the adjustment or resolution of differences in order to strike a bargain." *Gendron Realty, Inc. v. N.J. Gendron Lumber Co.*, 519 A.2d 723, 725 (Me. 1987). Missouri utilizes the following dictionary definition of negotiate: "to communicate or confer with another so as to arrive at the settlement of some matter." *Wenzel v. Holland-Am. Ins. Co. Tr.*, 13 S.W.3d 643, 646 (Mo. 2000) (en banc) (quoting *Webster's Third New International Dictionary* 1514 (1961)). In Colorado, "as it pertains to [real estate] licensing, the term 'negotiate' includes the act of bringing two parties together for the purpose of consummating a real estate transaction." *Brakhage v. Georgetown Assocs., Inc.*, 523 P.2d 145, 147 (Colo. App. 1974).

The meaning of negotiations in section 20.17(2) may also be ascertained by other provisions in chapter 20. *State v. Kamber*, 737 N.W.2d 297, 299 (Iowa 2007) (stating that "a statute is interpreted as an integrated whole"). We have frequently said that "[w]hen the same term appears multiple times in the same statute, it should have the same meaning." *See, e.g., State v. Paye*, 865 N.W.2d 1, 7 (Iowa 2015); *see also Carson v. Roediger*, 513 N.W.2d 713, 716 (Iowa 1994) (same).

The use of the term "negotiations" elsewhere in Iowa Code chapter 20 demonstrates a legislative intent to allow a public employer's representative to make a binding offer on behalf of the employer during negotiations. The definition of "impasse" is "the failure of a public employer and the employee organization to reach agreement in the course of negotiations." Iowa Code § 20.3(6); *see also Austin v. Kelley*, 88-HO-3475, at 9 (Nov. 16, 1988)[9] (concluding that impasse procedures are part

---

[9]*Available at* https://www.iowaperb.org/Document?db=IOWA-STATE-PERBS &query=(select+0+(byhits+(eq+ISSUANCE_DATE+%601988%2F11%2F16))) [https://perma.cc/4LTC-SCNN].

of the negotiation process). Thus, an agreement can be reached during, or "in the course of," negotiations. The ability to reach an agreement during negotiations implies the ability to make a binding offer during negotiations. It certainly does not exclude such ability.[10]

There is no reason to believe that the meaning of negotiations in the definition of impasse or in other provisions of chapter 20 is different from the meaning of negotiations in Iowa Code section 20.17(2). Thus, we

---

[10]There are two other provisions in chapter 20 that suggest the term "negotiations" includes the ability to reach agreement and, therefore, the ability to make a binding offer. In section 20.9, the legislature designates the mandatory, permissive, and excluded matters in the scope of negotiations. Iowa Code § 20.9. If negotiations only means discussions prior to a binding offer or agreement, the intent of section 20.9 would be thwarted because the final agreement could include matters that are excluded from the scope of negotiations. The more natural understanding of negotiations, once again, includes a binding offer. This understanding also comports with our caselaw. For instance, in *City of Mason City v. Public Employment Relations Board*, 316 N.W.2d 851, 854 (Iowa 1982), we said that the legislature excluded pensions from the scope of negotiations because "it is felt that significant matters of governmental policy, which pensions would seem to be from sheer cost alone, should remain outside the scope of negotiation so that citizen participation will not be precluded."

In another section, chapter 20 authorizes negotiations in a manner that would be futile if the meaning of the term "negotiations" did not include the ability to make a binding agreement. Iowa Code section 20.15(6)(*c*) states that collective bargaining agreements "shall be for two years" and "[t]he effective date of any such agreement shall be July 1 of odd-numbered years," but if a union's

> exclusive bargaining representative is certified on a date which will prevent the negotiation of a collective bargaining agreement prior to July 1 of odd-numbered years for a period of two years, the certified collective bargaining representative may negotiate a one-year contract with the public employer which shall be effective from July 1 of the even-numbered year to July 1 of the succeeding odd-numbered year when new agreements shall become effective.

Iowa Code § 20.15(6)(*c*). If negotiations only meant discussions without the ability to enter a binding agreement, the exception for one-year contracts in even-numbered years would be ineffectual. This is because the union and public employer would be able to discuss a one-year agreement for an even-numbered year, but they would be unable to enter the agreement because collective bargaining agreements "shall be for two years" and must take effect on July 1 of odd-numbered years. *Id.* The clear intent of the quoted exception is to allow the parties to reach a one-year agreement taking effect in an even-numbered year. And to effectuate that intent, the legislature used the term "negotiate." Thus, in section 20.15(6)(*c*), negotiate includes the ability to propose a binding offer.

should apply a consistent meaning. *Paye,* 865 N.W.2d at 7; *Carson,* 513 N.W.2d at 716.

Further, and perhaps most strikingly, Iowa Code chapter 20 imposes no preconditions on an employer to finalize a collective bargaining agreement. This must be contrasted with the statutory conditions imposed on a union, which is statutorily required to ratify an agreement by a majority of secret balloters. Iowa Code § 20.17(4). The absence in the statutory requirement for employer ratification is meaningful because we are bound by what the legislature actually said, not what it might have said. *Krull,* 522 N.W.2d at 612.

Finally, it is notable that the Iowa Code specifically allows the Regents "discretion [to] employ or retain attorneys or counselors when acting as a public employer for the purpose of carrying out collective bargaining and related responsibilities provided for under chapter 20." Iowa Code § 262.9(16). To carry out means "to bring to a successful issue," "to put into execution," and "to continue to an end or stopping point. *Carry out, Webster's.* By allowing an attorney to "carry[] out collective bargaining and related responsibilities" for the Regents, the legislature permits the Regents to empower a negotiator at least as much, if not more so, as public employers are generally permitted to do under section 20.17(2).

In sum, section 20.17(2) permits the public employer to designate a representative to make a binding offer. Section 262.9(16) further corroborates that the Regents have such authority. The statutory provisions show a clear expression and implication that, to the extent the law prior to enactment of the Public Employment Relations Act did not permit a public employer to authorize a representative to make a binding offer, the legislature changed the law. *Hines v. Ill. Cent. Gulf R.R.,* 330

N.W.2d 284, 289 (Iowa 1983). We must next determine whether PERB's rule withstands scrutiny in light of that statutory interpretation.

### III. Whether PERB's Rule Is Valid.

**A. Introduction.** PERB has a rule imposing a ratification requirement on the public employer before a "tentative" collective bargaining agreement may take effect. The version of PERB's rule in effect during the parties' collective bargaining discussions stated,

> *Acceptance or rejection by public employer.* The public employer shall, within ten days of the tentative agreement, likewise meet to accept or reject the agreement, and shall within 24 hours of the acceptance or rejection serve notice on the employee organization of its acceptance or rejection of the proposed agreement; however, the public employer shall not be required to either accept or reject the tentative agreement if it has been rejected by the employee organization.

Iowa Admin. Code r. 621—6.4(3).

The district court held that PERB's employer ratification requirement prevented the formation of a collective bargaining agreement because the Regents did not ratify the tentative agreement reached by the parties' representatives and approved by SEIU's membership. In response to a challenge to the rule's validity from SEIU, the district court found the rule valid because it "merely spells out when and how" a public employer is to "meet before voting on any action within the scope of its duties" under Iowa's open-meetings law.

SEIU reiterates before us its challenge to the validity of PERB's rule. "A party aggrieved by application of an administrative rule may challenge [the rule's] validity in an independent action where the rule is sought to be applied." *Jew v. Univ. of Iowa*, 398 N.W.2d 861, 864 (Iowa 1987).

The majority opinion in this case holds, consistent with the district court, that PERB's rule applies to this case, and in light of Iowa's open-meetings law, is valid. And since the administrative rule requires a public

employer to meet to accept a tentative agreement before a collective bargaining agreement can be formed, the opinion concludes that the Regents could not delegate authority to the designated representative to make a binding offer.

The decisional law on PERB's employer ratification requirement is sparse and consists of mere characterizations of the rule made in dicta. In *Moravia Community School District v. Moravia Education Association*, 460 N.W.2d 172, 178 (Iowa Ct. App. 1990), the court of appeals observed that the rule gives both the public employer and union the right to accept or reject the tentative agreement. Likewise, a PERB hearing officer has explained that "Rule 6.4 . . . essentially provides for a procedure whereby labor and management must ratify the terms of a proposed or 'tentative' collective bargaining agreement." *Local Union 2003, I.B.P.A.T. & Lyon County*, 80-HO-2013, at 3 (Oct. 30, 1981).[11] Another PERB hearing officer stated that, pursuant to the rule, a public employer always has an obligation to accept or reject the tentative agreement reached by its negotiating team. *AFSCME, AFL-CIO, Local No. 888 & City of Clinton*, 77-HO-838, at 8 n.10 (Feb. 18, 1977).[12] No Iowa appellate court has examined the validity of PERB's employer ratification requirement. Indeed, no reported judicial decision even turns on the employer ratification requirement. In short, this is a case of first impression.

In deciding whether PERB's rule is valid, I begin by determining the appropriate standard of review. Following that determination, I apply the

---

[11]*Available at* https://iowaperb.org/Document?db=IOWA-STATE-PERBS&query= (select+0+(byhits+(eq+ISSUANCE_DATE+%601981%2F10%2F30))) [https://perma.cc/3J4E-GGD6].

[12]*Available at* https://www.iowaperb.org/Document?db=IOWA-STATE-PERBS &query=(select+1+(byhits+(eq+ISSUANCE_DATE+%601977%2F02%2F18))) [https://perma.cc/552K-QXCG].

standard to PERB's rule. Finally, I evaluate the purported relevance of Iowa's open-meetings law to the validity of PERB's rule.

### B. Standard of Review.

1. *Overview.* An agency has only the authority or discretion delegated by law. Iowa Code § 17A.23(3). An agency cannot expand or enlarge its authority or discretion beyond the powers delegated to it. *Id.* And a grant of rulemaking authority is construed narrowly unless specifically provided in statute. *Id.*

Where agency action is based on statutory interpretation, our standard of review depends on whether the legislature has clearly vested in the agency the authority to interpret the statutory provision. *Id.* § 17A.19(10)(*c*), (*l*). If the legislature has so vested interpretive authority, we determine whether the interpretation is "irrational, illogical, or wholly unjustifiable." *Id.* § 17A.19(10)(*l*). If the legislature has not clearly vested interpretive authority in the agency to interpret the provision, we determine whether the agency's interpretation is "erroneous." *Id.* § 17A.19(10)(*c*). In the latter situation, our standard of review is for corrections of error at law and we are free to substitute our interpretation of the statute de novo. *Tremel v. Iowa Dep't of Revenue*, 785 N.W.2d 690, 692–93 (Iowa 2010). As is apparent, an agency interpretation is entitled to a greater amount of deference when the legislature has vested the agency with interpretive authority.

The Iowa approach to reviewing agencies' statutory interpretation is based on the following rationale:

> It would be improper for a court to simply substitute, without any deference to the agency's view, the court's own view of the meaning of a statutory term that the General Assembly had clearly delegated to the discretion of any agency to elaborate, because in that situation the court would be

violating the statute delegating that discretionary authority to the agency.

Arthur E. Bonfield, *Amendments to Iowa Administrative Procedure Act, Report on Selected Provisions to Iowa State Bar Association and Iowa State Government* 63 (1998) [hereinafter Bonfield].  *See generally* Cary Coglianese, Chevron*'s Interstitial Steps*, 85 Geo. Wash. L. Rev. 1339, 1349 (2017) ("[A] court doing anything other than deferring would be failing to honor the law itself, as these statutes expressly give the agencies the responsibility to define pertinent statutory terms.").  That rationale is an instance of the "faithful agent" theory of the judiciary's role in statutory interpretation.  Rooted in the constitutional separation of powers, the faithful agent theory holds that judges should give effect to the legislature's intent because the constitutional power to make law is located in the legislature.  *See* Valerie C. Brannon, Cong. Research Serv., R45153, *Statutory Interpretation: Theories, Tools, and Trends* 4–5 (2018), https://fas.org/sgp/crs/misc/R45153.pdf.

The legislature may clearly vest interpretive authority in two ways. *Renda*, 784 N.W.2d at 11–14.  One way is through an express grant of interpretive authority.  *Id.* at 11.  An express grant of interpretive authority occurs when the legislature "explicitly address[es] in legislation the extent to which an agency is authorized to interpret a statute."  *Id.*  For instance, in *Iowa Association of School Boards v. Iowa Department of Education*, 739 N.W.2d 303, 307 (Iowa 2007) (quoting Iowa Code § 256.9(16) (2003)), we noted that the department of education's enabling statute stated that "the director 'shall . . . [i]nterpret the school laws and rules relating to the school laws.' "

In addition, even in the absence of an express grant, the legislature may clearly vest in an agency the authority to interpret certain statutory

phrases or provisions. *Renda*, 784 N.W.2d at 11–14; *see* Bonfield at 63. This is based on the recognition that the IAPA's use of the term "clearly" is less restrictive than the term "expressly." *Renda*, 784 N.W.2d at 11. Under this mode of analysis, broad articulations concerning agency authority are avoided; instead, the focus is on the particular statutory phrase or provision at issue in a given case. *Renda*, 784 N.W.2d at 11–14. For example, in *Andover Volunteer Fire Department v. Grinnell Mutual Reinsurance*, 787 N.W.2d 75, 80 (Iowa 2010), we determined that the legislature did not intend to grant the workers' compensation commissioner the authority to interpret the statutory phrase "summoned to duty."

Therefore, to determine whether the legislature has clearly vested PERB with interpretive authority relevant to the question before us, we must consider both express and implicit vesting of interpretive authority. I first address express authority.

2. *Express vesting of interpretive authority.* In *State v. Public Employment Relations Board*, 744 N.W.2d 357, 360 (Iowa 2008), we considered whether PERB was granted interpretive discretion with respect to Iowa Code chapter 20 by examining the powers vested in the agency. We noted that the statute provided that

> [t]he general assembly declares that the purposes of the public employment relations board established by this chapter are to *implement* the provisions of this chapter and *adjudicate* and *conciliate* employment-related cases involving the state of Iowa and other public employers and employee organizations.

*Id.* (quoting Iowa Code § 20.1 (2001)). We also observed that the statute listed numerous powers and duties of PERB, including that PERB shall "[a]dminister the provisions [of this chapter]" and "adopt rules 'to carry out the purposes of this chapter.' " *Id.* (quoting Iowa Code §§ 20.1, .6 (2007)).

We concluded that "[w]hile it is obvious the legislature has afforded PERB extensive powers to implement and administer the provisions of chapter 20, it is not clear that the legislature intended to delegate interpretive powers to PERB." *Id.* We therefore reviewed PERB's statutory interpretation under the less deferential standard under Iowa Code section 17A.19(10)(*c*). *Id.*

Our analysis in *Public Employment Relations Board* predated the distinction between express and implicit vesting of interpretive authority explicated in *Renda*, 784 N.W.2d at 11–14. We did not use *Renda*'s phraseology or analytical approach. *See Pub. Emp't Relations Bd.*, 744 N.W.2d at 360. Instead, we broadly considered whether the agency had interpretive authority over the entirety of chapter 20 by virtue of the powers vested in the agency and did not consider whether the statutory phrases or provisions at issue in the case clearly vested interpretive authority in the agency. *See id.* Therefore, the precedential value of the decision is limited to this: the provisions we examined do not constitute an express grant of interpretive authority over the entirety of chapter 20.

We employed a similar analytical approach in *Waterloo Education Association v. Iowa Public Employment Relations Board*, 740 N.W.2d 418, 419–20 (Iowa 2007). We explained that because the interpretive question of whether a proposal is a mandatory subject of collective bargaining was not "explicitly" vested in PERB's discretion, our review was for correction of errors at law. *Id.* at 420.

Following those decisions, in 2010, the legislature expressly vested in PERB interpretive authority over chapter 20. 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011)). No longer was PERB only instructed to "[a]dminister" chapter 20; the new provision stated that "[PERB] shall . . . [i]nterpret, apply, and administer the provisions of this

chapter." Iowa Code § 20.6(1) (2011). The legislature withdrew that authority on February 17, 2017. 2017 Iowa Acts ch. 2, § 2 (codified at Iowa Code § 20.6(1) (2018)).

The majority opinion in this case would defer to PERB's interpretation of Iowa Code chapter 20 as to its statutory authority to promulgate rule 621—6.4(3) because of the legislature's 2010 express grant of interpretive authority. The reasoning, however, is unsound.

There are three problems with relying on the 2010 express grant to defer to PERB. First, an express grant of interpretive authority is not relevant to our standard of review if it did not "appl[y] to the agency action at the time that action was taken." Iowa Code § 17A.19(8)(*b*) (2017). Consequently, an express grant of interpretive authority postdating an agency action based on interpretation is not a reason to defer to the agency interpretation. Second, even if one were to interpret the section 17A.19(8)(*b*) requirement to permit for retroactive application of an express grant of interpretive authority, there is no indication of legislative intent to make the 2010 express grant retroactive. Third, if the 2010 express grant is viewed as retroactive, the same view should be taken on the 2017 withdrawal of express interpretive authority.

For purposes of brevity, I focus on the first proposition. The relevant question for determining our standard of review is not whether an agency has ever been granted interpretive authority, or even whether the Iowa statutes generally applicable during the factual circumstances of a particular case would grant interpretive authority to an agency that takes action during that time. Instead, the relevant question is whether the agency action challenged by the aggrieved party is based on an interpretation made by the agency *while it had interpretive authority*.

The IAPA, I think, mandates this approach. The IAPA instructs the court to "reverse . . . agency action" under a host of conditions, two of which concern agency action based on statutory interpretation. *See id.* § 17A.19(10)(*c*), (*l*). As noted above, the distinction between the two provisions is whether interpretation of the statutory provision in question has "clearly been vested by a provision of law in the discretion of the agency." *Id.* I acknowledge that, standing alone, those IAPA sections could be read as requiring deference to an agency interpretation if, *at any time*, interpretive authority has "clearly been vested by a provision of law in the discretion of the agency." But that reading is foreclosed by a neighboring provision of section 17A.19.

Section 17A.19(8)(*b*) instructs that "[t]he validity of agency action must be determined in accordance with the standards of review provided in this section, *as applied to the agency action at the time that action was taken.*" *Id.* § 17A.19(8)(*b*) (emphasis added). Pursuant to section 17A.19(8)(*b*), we must apply our standard of review to the circumstances existing when the agency took action. *See Brummer*, 661 N.W.2d at 168 n.1 (Iowa 2003) (explaining that under section 17A.19(8)(*b*), "we must focus on the agency's actions during the time period in which" the agency took the action challenged by appellant). Thus, in order for an agency interpretation to be granted deference, the IAPA requires a temporal identity between interpretive authority and the agency action based on statutory interpretation.

Moreover, the grammatical subject at issue in Iowa Code section 17A.19(10) is "agency action." The IAPA thus instructs us to review the circumstances of that action. There is no suggestion in the IAPA that agency action may be somehow temporally disconnected from, or not an exercise of, a clear vesting of interpretive authority. Similarly, the statute

is silent on the notion that there may be a temporal disconnect between the provision of law interpreted and the provision of law vesting the agency with interpretive authority.

Consider our deference rules in practice. Suppose an agency takes final action based on its interpretation of a statute. Later, the legislature expressly vests the agency with interpretive authority and, afterwards, a case challenging the agency action comes before us. Then, the legislature withdraws the express grant of interpretive authority, and another case comes before us involving a challenge to the same agency action. Would we apply a different standard of review to the same agency action in the two cases? The IAPA answers that problem in telling us to review "agency action," not later circumstances, and, even more specifically, "agency action at the time that action was taken." *Id.* § 17A.19(8)(*b*), (10).

Additionally, the temporal identity requirement is consistent with the rationale for deferring to agency interpretations. As explained above, the rationale for deference is based on the notion that if the legislature delegates discretionary authority to an agency to interpret a statutory term, the court would violate that legislative choice were it to substitute its own view of the proper interpretation without any deference to the agency. Bonfield at 63. By the same token, where an interpretation predates an express grant of interpretive authority, the court honors the prior legislative choice to not grant interpretive authority by refusing to defer. Moreover, the rationale is premised on the notion that the agency actually exercises its express interpretive authority, something which would be impossible for an agency that acted before the express grant was in existence.

Our precedent also demands a temporal identity between interpretation and interpretive authority. Under the IAPA, we have

explained that "[o]ur standard of review depends on the aspect of the agency's decision that forms the basis of the petition for judicial review." *Simon Seeding & Sod, Inc. v. Dubuque Human Rights Comm'n*, 895 N.W.2d 446, 455 (Iowa 2017) (quoting *Burton v. Hilltop Care Ctr.*, 813 N.W.2d 250, 256 (Iowa 2012)). So, where an agency's statutory interpretation forms the basis of the challenge to the agency action, our standard of review depends on that interpretation. Requiring a temporal identity between the agency's interpretation and the existence or nonexistence of clearly vested interpretive authority ensures that our standard of review depends on the interpretation. Without such a requirement for temporal identity, our standard of review would instead depend on an unbridled rifling through past and present statutes to uncover any express delegation of interpretive authority.

Further, an agency has only the authority or discretion delegated by law. Iowa Code § 17A.23(3); *see Brakke v. Iowa Dep't of Nat. Res.*, 897 N.W.2d 522, 533 (Iowa 2017) ("The power of the agency is limited to the power granted by statute."). The provision codifies the law that an agency "may not exercise any authority outside the scope of that lawfully delegated authority." Bonfield at 73. A retroactive delegation of interpretive authority conflicts with that provision because it would allow an agency to act with interpretive authority it lacks at the time of action. If at all possible, we harmonize apparent conflicts among statutes. *Papillon v. Jones*, 892 N.W.2d 763, 773 (Iowa 2017).

For similar reasons, a retroactive delegation of interpretive authority could present separation of powers problems. We interpret statutes to avoid constitutional problems. *In re Guardianship of Kennedy*, 845 N.W.2d 707, 711–14 (Iowa 2014). Our constitution provides for a separation of powers in stating that "no person charged with the exercise of powers

properly belonging to [either the legislative, executive, or judicial department] shall exercise any function appertaining to either of the others." Iowa Const. art. III, § 1. Thus, an agency cannot exercise a nondelegated lawmaking power held by the legislature or judicial branch. When the express delegation is not in existence, the agency does not act with its power. *See City of Arlington v. Fed. Commc'ns Comm'n*, 569 U.S. 290, 312, 133 S. Ct. 1863, 1877 (2013) (Roberts, C.J., dissenting) ("An agency cannot exercise interpretive authority until it has it . . . ."). A retroactive delegation of interpretive power would seem to violate the constitutional requirement of separation of powers because, at the time the agency acted, it lacked interpretive power.

This approach appears to be consistent with federal law. The Supreme Court recognizes that Congress may explicitly or implicitly leave a gap for the agency to fill. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S. Ct. 2778, 2782 (1984). "If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* In such circumstances, "any *ensuing* regulation" is entitled to deference. *United States v. Mead Corp.*, 533 U.S. 218, 227, 121 S. Ct. 2164, 2171 (2001) (emphasis added). By its use of the word "ensuing," the Court suggests that regulations entitled to deference are those which occur after or as a result of the explicit delegation. And the Court's decisions bear out that deference is accorded agency actions taken pursuant to an express delegation. *See, e.g., Atkins v. Rivera*, 477 U.S. 154, 162, 106 S. Ct. 2456, 2461 (1986) ("Because the Secretary's regulation . . . is adopted pursuant to the explicit grant of rulemaking authority . . . it is 'entitled to more than mere deference or weight.'" (quoting *Schweiker v. Gray Panthers*, 453 U.S. 34, 44, 101 S. Ct. 2633,

2640 (1981)); *see also Rodriguez v. Sec'y of Health & Human Servs.*, 856 F.2d 338, 341 (1st Cir. 1988) ("The Secretary's rules governing maximum fees are . . . made pursuant to an explicit statutory delegation. They have, therefore, 'legislative effect.' " (quoting *Hogan v. Heckler*, 769 F.2d 886, 888 (1st Cir. 1985))).

In addition, the reason for refusing to defer here is consistent with the majority opinion released today in *United Electrical, Radio & Machine Workers of America v. Iowa Public Employment Relations Board*, ___ N.W.2d ___ (Iowa 2019). There, the majority holds that it would not employ the express delegation theory to defer to an agency interpretation made after the legislature withdrew express interpretive authority from the agency's organic statute. *Id.* at ___. Conversely, is there a reason to defer to an agency interpretation that preceded an express delegation of interpretive authority? The answer to this question, I think, must also be no. Underlying the answer to both scenarios is the notion that the legislature has reserved the right to delegate the authority held by administrative agencies. Iowa Code § 17A.23(3). We should not subvert the legislature's choice.

Therefore, we should interpret Iowa Code section 17A.19(10)(*c*), (*l*) as requiring a temporal identity between an agency action based on statutory interpretation and interpretive authority vested by a provision of law.

3. *No express grant of interpretive authority applied when PERB interpreted chapter 20 to enact or modify its employer ratification requirement.* PERB's rule was initially promulgated in 1975. *See* Iowa Admin. Code r. 660—6.4 (1975). At that time, the rule stated that the public employer's governing body must accept or reject a proposed

44

agreement but only after a majority of voting members of the employee union supported ratification of the agreement.  *See id.*

PERB substantively modified its rule a few times in the seven years after 1975.  Just one year after initially promulgating the rule, PERB changed the rule to only require that "[t]he public employer shall serve notice on the employee organization of its acceptance or rejection of the proposed agreement."  *See id.* r. 660—6.4 (Supp. Sept. 22, 1976).  That language removed the conditions that the union ratify the agreement before the employer does so and that acceptance be done by the employer's governing body.  *See id.*  Then, in 1979, PERB reinserted the requirement for the public employer to wait until the union membership ratifies the agreement before meeting to accept or reject the agreement.  *See id.* r. 660—6.4 (Supp. Oct. 3, 1979).  Finally, in 1982, PERB again removed the waiting requirement and provided that, while a public employer had to meet to approve or reject a tentative agreement, it need not do so if the tentative agreement had already been rejected by the union membership. *See id.* r. 660—6.4 (Supp. Nov. 10, 1982).

PERB's initial rule and the three modifications between 1976 and 1982 are based on interpretations of the statute.  At the time, just as it did during the parties' negotiations from 2016 to 2017, chapter 20 authorized a public employer to designate an individual to engage in collective bargaining negotiations, *see* Iowa Code § 20.17(2) (1975), and the only express ratification requirement applied to public employees, *see id.* § 20.17(4).  Since PERB's employer ratification requirement and associated waiting period are not found on the face of the statute, they necessarily involve statutory interpretations.

Meanwhile, from 1975 to 1982, PERB did not have express interpretive authority over chapter 20.  PERB's powers and duties were the

same as, or fewer than, those we found to not grant interpretive authority in *Public Employment Relations Board*, 744 N.W.2d at 360. *See* Iowa Code § 20.6 (1975) (providing the board shall "[a]dminister the provisions of this chapter"). Moreover, of course, the express delegation of interpretive authority granted in 2010 was not in existence in 1975. Therefore, when it promulgated and amended its rule in 1975 and through 1982, PERB was not clearly vested with interpretive authority by an express provision. PERB's employer ratification requirement has not been substantively changed since 1982.

In 2015, PERB made "nonsubstantive amendments" to the public *notification* requirements also located in rule 6.4. 38 Iowa Admin. Bulletin 1046, 1046 (Dec. 9, 2015). PERB added the following clarifying phrase, indicated in italics, to the notification requirement:

> The public employer shall, within ten days of the tentative agreement, likewise meet to accept or reject the agreement, and shall within 24 hours *of the acceptance or rejection* serve notice on the employee organization of its acceptance or rejection of the proposed agreement . . . ."

*Id.* at 1048. *That amendment does not modify the employer ratification requirement.* Moreover, the amendment did not interpret the statutory authority to designate a representative to engage in negotiations in Iowa Code section 20.17(2) or the statutory ratification requirements in Iowa Code section 20.17(4). It is simply, as PERB itself put it, a "nonsubstantive" change to clarify PERB's notification requirement. *Id.* at 1046. And, the amendment was made pursuant to PERB's rulemaking authority under Iowa Code section 20.6(5), not its interpretive authority. *Id.*

The majority, therefore, is wrong to assert that we should defer to PERB's rule because, according to the majority, PERB's 2015 amendments

"necessarily construed" chapter 20. Under the majority's approach, any administrative action would merit deference under Iowa Code section 17A.19(10)(*l*) so long as an express delegation of interpretive authority existed at the time. That cannot be right. Deference is only granted under section 17A.19(10)(*l*) to an agency action that is (i) based on statutory interpretation and (ii) prejudicial to the substantial rights of the person seeking judicial relief. The 2015 amendments are neither.

Consequently, the agency action involved in this case is based on an interpretation of Iowa Code chapter 20 by an agency that was not clearly vested with interpretive authority by an express grant of authority. As such, unless PERB has implicit interpretive authority over Iowa Code section 20.17(2), (4), our review is for correction of errors at law. Iowa Code § 17A.19(10)(*c*).

4. *Implicit vesting of interpretive authority.* As noted above, the legislature may clearly vest interpretive authority even if there is no express grant of interpretive authority. *Renda*, 784 N.W.2d at 11–14. In evaluating whether the agency has implicit interpretive authority, the focus is on the particular statutory phrase or provision at issue in a given case. *Id.* at 11–14. "[B]road articulations of an agency's authority, or lack of authority, should be avoided in the absence of an express grant of broad interpretive authority." *Id.* at 14.

To determine that the legislature has clearly vested interpretive authority in the absence of an express grant, we must be "firmly convinced that 'the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration' of the terms." *Id.* at 14 (quoting Bonfield at 63). The "clearly been vested" requirement is more stringent than the view that federal law affords deference to an agency

interpretation when the language of a statute does not clearly and unambiguously answer a particular question. Bonfield at 63. We must examine the phrases or statutory provisions to be interpreted, their context, the purpose of the statute, the functions of and duties imposed on the agency, and other practical considerations to determine whether the legislature intended to give interpretive authority to an agency. *Renda,* 784 N.W.2d at 11–12.

When the statutory provision being interpreted is a substantive term within the special expertise of the agency, we have concluded that the agency has been vested with the authority to interpret the provision. *Id.* at 14 (collecting cases). For instance, in *Evercom Systems, Inc. v. Iowa Utilities Board,* 805 N.W.2d 758, 762–63 (Iowa 2011), we found the utilities board had been vested with authority to interpret the statutory phrase "unauthorized change in service" because it was a substantive term within the special expertise of the agency. We are also more likely to defer to an agency interpretation when the agency necessarily must interpret the statutory language at issue in carrying out its duties, but that basis standing alone is unlikely to be sufficient to warrant deference. *See Ramirez-Trujillo v. Quality Egg, L.L.C.,* 878 N.W.2d 759, 769–70 (Iowa 2016); *Iowa Ins. Inst. v. Core Grp. of Iowa Ass'n for Justice,* 867 N.W.2d 58, 65, 77 (Iowa 2015).

On the other hand, when provisions to be interpreted are found in a statute other than the statute the agency has been tasked with enforcing, or where a term has an independent legal definition that is not uniquely within the subject matter expertise of the agency, we conclude the agency has not been vested with interpretative authority. *Banilla Games, Inc. v. Iowa Dep't of Inspections & Appeals,* 919 N.W.2d 6, 12–13 (Iowa 2018); *Renda,* 784 N.W.2d at 14 (collecting cases). Similarly, we refuse to find

interpretive authority over statutory language that is not complex or specialized, or which does not appear on its face to be technical. *See Banilla Games*, 919 N.W.2d at 13; *Irving v. Emp't Appeal Bd.*, 883 N.W.2d 179, 185 (Iowa 2016).

For instance, in *Renda*, we concluded that the Iowa Civil Rights Commission did not have interpretive authority over the terms "employee" and "dwelling." 784 N.W.2d at 14. Our analysis turned on the facts that both terms have specialized legal meaning, are widely used in areas of law other than the civil rights arena, and required for their interpretation the agency to consider provisions of law in other statutes. *Id.* Likewise, in *Neal v. Annett Holdings, Inc.*, 814 N.W.2d 512, 519 (Iowa 2012), we decided that because the phrase "suitable work" is found in other legal contexts and has a specialized legal meaning extending beyond the context presented in the case, we would not defer to the commissioner's interpretation of the phrase in the workers' compensation statute. In *Simon Seeding & Sod*, we held that the Dubuque Human Rights Commission was not entitled to deference for its interpretation of the phrase "regularly employs" because the phrase "is not a specialized term of art requiring the agency's unique expertise to apply" and "is used in other Iowa statutes." 895 N.W.2d at 455–56. And in *Bluml v. Dee Jay's Inc.*, 920 N.W.2d 82, 84 (Iowa 2018), we explained that the phrase "aris[es] out of . . . employment" is not technical or within the special expertise of the workers' compensation commissioner.

We have also been clear that rulemaking authority is not a conclusive determination of interpretive authority. Our precedent is replete with instances where we have determined that an agency was not clearly vested with interpretive authority despite the presence of rulemaking authority. *See Iowa Dental Ass'n v. Iowa Ins. Div.*, 831 N.W.2d

138, 143–44 (Iowa 2013) (collecting cases); *Renda*, 784 N.W.2d at 12–13 (same). As we said in *Iowa Dental*, "[G]ranting the authority to make rules for enforcement purposes is not the same as granting authority to make interpretive rules." 831 N.W.2d at 144, *accord Rilea*, 919 N.W.2d at 385.

To my mind, the legislature has not implicitly granted PERB interpretive authority over the designated negotiator provisions in Iowa Code section 20.17(2) or the union ratification requirements in Iowa Code section 20.17(4).

Negotiations are a subject that cuts across many areas of statutory law.[13] Even more specifically, other statutory provisions concern a person's authority to designate a negotiator to act on her behalf. *See, e.g.,* Iowa Code § 9A.102(1) (providing that a student athlete may authorize a person to negotiate a professional sports or endorsement contract on the student's behalf). Similarly, while the Iowa Code provides that the department of administrative services negotiates collective bargaining agreements for other agencies, the Regents' authority to negotiate collective bargaining agreements is distinguished. *Id.* § 8A.402(1)(*g*). Negotiations are also an issue that courts have developed in the common law of contracts. *See, e.g.*, *In re Marriage of Masterson*, 453 N.W.2d 650, 654 (Iowa Ct. App. 1990) ("It goes without saying that whether preliminary

---

[13]*See, e.g.,* Iowa Code §§ 6B.2B, .54 (2017) (requiring agency to make a good faith effort to negotiate before condemning property by eminent domain); *id.* § 8B.24(5)(*b*) (providing conditions under which information technology may be procured by negotiation); *id.* § 28J.9(18)(*c*) (authorizing board of directors to provide criteria for port authority construction contracts in certain circumstances); *id.* § 68B.31(8) (authorizing negotiated settlements of legislative ethics committee complaints); *id.* § 73.19 (authorizing negotiated contracts in awarding a contract under the targeted small business procurement goal program); *id.* § 99D.9C(4)(*c*)(1) (stating that if parties cannot reach agreement on the terms of a lease associated with greyhound racing and begin arbitration, "[t]he parties may continue to negotiate all offers until an agreement is reached or a decision is rendered by the arbitrators"); *id.* § 103A.51(7) (defining a "manufactured or mobile home retailer" as a person who attempts to negotiate a sale of a manufactured home).

negotiations actually ripen into an oral contract depends upon the intention of the parties as gleaned from the facts of the case."). Therefore, PERB cannot claim any special expertise to interpret the meaning of negotiations. *See Banilla Games*, 919 N.W.2d at 12–13; *Renda*, 784 N.W.2d at 14; *cf. Evercom Sys.*, 805 N.W.2d at 762–63 (finding the statutory phrase "unauthorized change in service" to be a substantive term within the special expertise of the Iowa Utilities Board).

Moreover, the union ratification requirements in section 20.17(4) do not involve complex or specialized subject matter. There is no special expertise held by PERB relevant to interpreting the provision. Indeed, the majority opinion in this case admits as much, stating that "SEIU's challenge is facially compelling if the statute is read in isolation." And a need to refer to other statutes in interpreting the provision—as the Regents and the majority opinion in this case argue with respect to Iowa's open-meetings law—further suggests that the agency is not implicitly vested with interpretive authority. *See Renda*, 784 N.W.2d at 14. Granted, PERB necessarily must apply, and maybe even interpret, section 20.17(4) in carrying out its duties, but that basis standing alone does not warrant deference. *See Ramirez-Trujillo*, 878 N.W.2d at 769–70; *Iowa Ins. Inst.*, 867 N.W.2d at 65, 77.

Finally, even if Iowa's open-meetings law were relevant to our analysis, PERB has no special expertise relevant to interpreting its provisions. And there is no express grant of interpretive authority to PERB over the provisions of the open-meetings law.

Therefore, PERB's employer ratification requirement is based on a statutory interpretation made by an agency not clearly vested with authority to interpret the statutory provisions. *See* Iowa Code

§ 17A.19(10)(*c*).   Consequently, our review should be for correction of errors at law.  *See Tremel*, 785 N.W.2d at 692–93.

**C.  Application of Standard of Review to PERB's Rule.**  PERB's employer ratification requirement is erroneous.   It is contrary to the legislature's authorization of a designated representative to engage in negotiations in Iowa Code section 20.17(2), as detailed in division II *supra.* And the requirement is contrary to the specific authorization for the Regents to employ an attorney or counselor for "carrying out collective bargaining and related responsibilities."   Iowa Code § 262.9(16).   In addition, the requirement conflicts with section 20.17(4), which only requires union ratification; we are bound by what the legislature actually said, not what it might have said.  *Krull*, 522 N.W.2d at 612.  PERB's rule might have been valid if it said that a public employer *may* demand a ratification opportunity, but that is not what PERB did.  Consequently, I conclude that PERB's employer ratification requirement must be set aside. Iowa Code § 17A.19(10)(*c*).

Before turning to Iowa's open-meetings law, there is perhaps one consideration worth mentioning.   We have said that legislative acquiescence to a longstanding administrative rule may be a factor that saves the rule.  *See, e.g.*, *Lowe's Home Ctrs., LLC v. Iowa Dep't of Revenue*, 921 N.W.2d 38, 48 (Iowa 2018).  Whatever the merits of that doctrine, a rule is invalid, "no matter how long it has existed or been exercised by administrative authority," if it would "change the law by giving to the statute or Act an interpretation or construction of which its words are not susceptible."  *Nishnabotna Valley Rural Elec. Coop. v. Iowa Power & Light Co.*, 161 N.W.2d 348, 352 (Iowa 1968).  A rule is invalid if it is "at variance with statutory provisions" or "nullif[ies] legislative intent."  *Schmitt v. Iowa Dep't of Soc. Servs.*, 263 N.W.2d 739, 745 (Iowa 1978).   The employer

ratification requirement conflicts with Iowa Code section 20.17 and in that way would give the statutory provisions therein a construction of which their words are not susceptible. As such, the longevity of PERB's rule is of no moment. The rule should have never come into existence, and in this case of first impression, we should erase it.

**D. Relationship of Open-Meetings Law to the Question Before Us.** The majority opinion in this case holds that PERB's rule is valid in light of the open-meetings law. The opinion suggests that any action taken contrary to the open-meetings law is void. That proposition is simply incorrect.

First, section 20.17(3) states that "[n]egotiating sessions . . . shall be exempt from the provisions of [the open-meetings law]." Iowa Code § 20.17(3). As discussed, during negotiating sessions, a public employer's representative may make a binding offer that requires no further action by the employer. Therefore, the open-meetings law does not apply.

Further, Iowa Code section 20.17(4) provides that "[t]he terms of a proposed collective bargaining agreement shall be made available to the public by the public employer." That requirement already achieves the goal that would otherwise be accomplished by an open meeting: "safeguard[ing] free and open democracy by ensuring the government does not unnecessarily conduct its business in secret." *Hutchison v. Shull*, 878 N.W.2d 221, 237 (Iowa 2016). Holding an open meeting to formally adopt the terms does nothing further. Can anyone seriously believe that a telephonic meeting which is called to order and adjourned within five minutes, as the record shows the Regents did to formally adopt a collective bargaining agreement in March 2017, meaningfully advances the goals of the open-meetings law, especially when the terms of the collective bargaining agreement are already made public?

Additionally, the majority opinion in this case would allow a general statute to override a more specific statute. When a general and specific statute conflict, we do not allow the general statute to override the specific one. Iowa Code § 4.7; *Rilea*, 919 N.W.2d at 388 n.6. Chapter 20 specifically refers to collective bargaining. Even more specifically, section 20.17(2) authorizes the public employer to designate a representative to reach agreement, and section 20.17(4) does not impose any conditions on a public employer before a collective bargaining agreement is finalized. By contrast, the open-meetings law is a general law concerning openness at public meetings. Therefore, the open-meetings law should not override the specific provisions in chapter 20.

There is some authority from other jurisdictions that a designated representative of a public employer may make an offer that binds the employer irrespective of an open-meetings requirement. In *South Benton Education Association v. Monroe Union High School District*, 732 P.2d 58, 59 (Or. Ct. App. 1987), an Oregon court considered whether a local school board could authorize its designated representative to enter into a binding contract notwithstanding a statute that required all meetings to be open to the public. The Oregon court observed that under the statute related to public employee collective bargaining, it was an unfair labor practice to refuse to reduce to writing and sign an agreement previously reached by collective bargaining. *Id.* at 62. The Oregon court also held that the more specific statute related to public employee collective bargaining prevailed over the more general statute related to meetings being open to the public. *Id.*

Once again, this is not to say that the public employer cannot hold an open meeting to adopt a collective bargaining agreement. Rather, it is only to say that the Iowa Code does not so require.

Even if the open-meetings law applied, its provisions do not support summary judgment in this case. The open-meetings law provides that an action which violates its substantive provisions is void only

> if the suit for enforcement of this chapter is brought within six months of the violation and the court finds under the facts of the particular case that the public interest in the enforcement of the policy of this chapter outweighs the public interest in sustaining the validity of the action taken in the closed session.

Iowa Code § 21.6(3)(*c*). Here, no open-meetings action was filed within six months by an "aggrieved party," and no court has engaged in the balancing of policy interests to declare the Regents' action void. It would take some fortitude for a lawyer to argue on behalf of the Regents that they sought relief under the open-meetings law for their own violation. As a result, the open-meetings law provides no basis for relieving the Regents of potential liability in this case.

In sum, a public employer can authorize a representative to make a binding offer and PERB's rule to the contrary is invalid. Therefore, the next question becomes whether, in this case, there is a triable issue of fact that a binding offer was made in this case.

**IV. Whether There Is a Genuine Dispute that the Designated Representative Made a Binding Offer.**

As Chief Justice Cady explains, the question in this case becomes whether the Regents intended to authorize their representative to make a binding offer. I agree with his resolution. PERB's invalid rule, it seems, was a factor in how the Regents authorized the representative to negotiate on their behalf. It appears that, with the rule in mind, the Regents did not intend the representative to make a binding offer.

However, in the summary judgment proceeding, the district court did not grant summary judgment based on the Regents' intent concerning

the scope of the representative's authority. Instead, the district court considered PERB's rule valid and grounded its summary judgment decision on that basis. The district court's argument reflects the Regents' summary judgment motion which also focused on the validity and obligations of the rule rather than how the rule affected the Regents' intentions regarding their representative's authority. The argument not presented to and considered by the district court involves "a different legal theory with a different factual predicate than the issues actually litigated in the summary judgment proceedings." *Winger Contracting Co. v. Cargill, Inc.*, ___ N.W.2d ___, ___ (Iowa 2019). We cannot affirm a grant of summary judgment on a basis that was not presented to and considered by the district court. *See Lamasters*, 821 N.W.2d at 863–64; *Meier*, 641 N.W.2d at 537. Therefore, I conclude that SEIU should survive summary judgment on this point.

**V. Whether the Regents Are Entitled to Summary Judgment Based on Revocation of the January 10 Offer.**

There is a legal question on whether a negotiator may revoke a binding offer after the union indicates its acceptance but before the union ratifies the proposed agreement. Under Iowa Code section 20.17(4), the union must ratify a proposed agreement by majority vote of voting members of the union.

On the one hand, the authority to negotiate suggests an ability to revoke an offer before it is duly accepted. "Negotiations occur only where there exists an opportunity for an offeror to modify or revise its proposal." *Drexel Heritage Furnishings*, 7 Cl. Ct. at 154. Further, under contract law, a party may revoke an offer at any time prior to the creation of a contract by acceptance. *Younglove v. Hoberg*, 195 Iowa 281, 285, 191 N.W. 985,

987 (1923); 1 Richard A. Lord, *Williston on Contracts* § 5:8, at 960–61 (4th ed. 2007) [hereinafter *Williston on Contracts*].

On the other hand, we do not strictly apply contract law in collective bargaining, *Sergeant Bluff-Luton Educ. Ass'n v. Sergeant Bluff-Luton Cmty. Sch. Dist.*, 282 N.W.2d 144, 150 (Iowa 1979); *see Pepsi-Cola Bottling Co. of Mason City v. NLRB*, 659 F.2d 87, 89 (8th Cir. 1981), and the duty to negotiate in good faith may preclude revocation after the union indicates its acceptance even if the members have not yet voted to ratify, *see* Iowa Code §§ 20.9(1), .10(1). For instance, a PERB administrative law judge concluded that a city failed to make good-faith efforts in reaching agreement when, after the parties' representatives reached a tentative agreement but before the union could properly ratify the agreement, the city attempted to impose a new offer and renounce the tentative agreement. *Commc'n Workers of Am., Local 7113 v. City of Council Bluffs*, 88-HO-3723, at 12 (Aug. 24, 1988);[14] *cf. Ottumwa Cmty. Sch. Dist. v. Ottumwa Educ. Ass'n*, 82-HO-2140, at 8 (Jan. 29, 1982) (suggesting that "the obvious need for some flexibility in the process" weighs against an "inability to withdraw from tentative agreements *for good cause*" (emphasis added)).[15]

This case, however, does not require us to resolve that legal question. This is because, even if the Regents *could have* revoked the January 10 offer after the union indicated its intention to accept, the State

---

[14]*Available at* https://www.iowaperb.org/Document?db=IOWA-STATE-PERBS &query=(select+0+(byhits+(match+PERB_CASE_NUMBER+%6088-HO-3723))) [https:// perma.cc/WFU3-GC43].

[15]*Available at* https://www.iowaperb.org/Document?db=IOWA-STATE-PERBS &query=(select+1+(byhits+(eq+ISSUANCE_DATE+%601982%2F01%2F29))) [https:// perma.cc/3VNS-285B].

is not entitled to summary judgment because of the presence of factual issues.

The record shows the following facts. On January 25, SEIU's negotiator wrote Galloway that "SEIU has agreed to the terms of the [Regent's] final offer sent via email on January 10, 2017" and noted SEIU's plans to "hold a ratification vote as quickly as possible."

Galloway and the SEIU negotiator conversed by phone on January 31. According to the State's statement of undisputed facts, Galloway "informed SEIU there was no tentative agreement for the parties to ratify." In his affidavit, Galloway says that he told his counterparty on January 31 "that there was not an agreement to be ratified and that the parties need to continue to bargain." SEIU, by contrast, avers that Galloway "orally stated that the Regents believed the parties had not reached an agreement" but denies that Galloway stated there was "no tentative agreement for the parties to ratify." According to an affidavit from SEIU's negotiator, Galloway and Timothy Cook stated during the call that "in their opinion an agreement had not been reached" and "the Regents, through their representative, never withdrew their offer of January 10th."

The parties do not seem to dispute that Galloway failed to expressly revoke the Regents' January 10 offer during the January 31 call. SEIU's negotiator made this point in his affidavit, stating, "During the course of this phone call, the Regents, through their representative, never withdrew their offer of January 10th." The State's statement of undisputed facts, memorandum in support of summary judgment, and supporting affidavits do not dispute the point made in the SEIU affidavit. Indeed, the State's memorandum in support of summary judgment does not even argue that the offer was withdrawn.

The next day, February 1, the SEIU representative sent Galloway an email. That email stated,

> In light of our conversation yesterday, I wanted to recap the situation in which SEIU, as the legal representatives of approximately 3,500 health care professionals, and the Board of Regents find themselves.
>
> On January 10, 2017 you sent SEIU, as the chief negotiator for the Board of Regents, a final contract offer.
>
> On January[] 25, 2017, SEIU accepted the offer with both a voice message and an email message.
>
> On January 31, during a telephone conversation, you and Tim Cook informed me that the Board of Regents believed the parties had not, in fact, reached . . . an agreement.
>
> As I said yesterday, SEIU plans to hold its ratification vote in the very near future. I will inform you of the results.
>
> Please let me know if the Board of Regents' position changes.

Following that email, on February 7, SEIU members ratified their acceptance of the offer, and the SEIU negotiator wrote to Galloway to inform him of the ratification.

The record, it seems to me, is undisputed that the January 10 offer was never revoked by the Regents. The district court so concluded based on the undisputed statement in the SEIU affidavit concerning express revocation. The failure to identify a disputed fact and provide supporting evidence can lead to a finding that an issue is undisputed. *Diamond Prods. Co. v. Skipton Painting & Insulating, Inc.*, 392 N.W.2d 137, 139 (Iowa 1986). We should accept the district court's finding, not ignore, evade, or obscure it.

Even if SEIU cannot show that it is undisputed that the Regents did not revoke the January 10 offer, I think a reasonable fact finder could conclude that they did not revoke the offer. Professor Williston's treatise

explains the law on whether a communication is sufficient to act as a revocation:

> The question what communication will operate as a revocation is a question of interpretation. In general, any statement which clearly indicates or implies unwillingness on the part of the offeror to contract according to the terms of the offer is sufficient, though the offeror does not use the word "revoke" or any similar operative language. . . . In the ideal world, a revocation when properly made should be as direct and explicit as an acceptance; if the offeror uses equivocal or inexplicit language, it may not be sufficient to operate as a revocation. Whether it has that effect will ordinarily be a question of fact, depending upon what a reasonable person in the position of the offeree would have thought.

1 *Williston on Contracts* § 5:8, at 965–67.

The only evidence put forward on revocation by the Regents is Galloway's affidavit, which avers that on January 31 he stated "that there was not an agreement to be ratified and that the parties need to continue to bargain." That statement, viewed in the light most favorable to SEIU, does not clearly indicate or imply unwillingness to contract according to the terms of the offer, especially given the Regents' apparent nonresponse to SEIU's letter the next day informing Galloway of SEIU's intention to vote on the offer. *Id.*; *see also Pepsi-Cola*, 659 F.2d at 90 ("[W]e conclude that the July 12th proposal remained viable because the Company failed to expressly withdraw its offer prior to acceptance and because the circumstances do not indicate that the parties could have reasonably considered the offer withdrawn."). And even if the statement is sufficient to shift the burden to SEIU, its representative specifically disputed the point by affidavit. According to SEIU, Galloway only "orally stated that the Regents believed the parties had not reached an agreement." A reasonable fact finder, it seems to me, could credit testimony from SEIU and consequently believe that Galloway only indicated that there was no

agreement because the union members had not yet ratified the agreement. There is thus, at least, a genuine dispute of material fact. Consequently, I would find that SEIU survives summary judgment on this point.

**VI. Conclusion.**

For the reasons expressed above, I would vacate the grant of summary judgment and remand to the district court for further proceedings.

Wiggins, J., joins this dissent.